704 A.2d 1003

JANET C. DENIS, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. CITY OF NEWARK AND NEWARK POLICE DEPARTMENT, DEFENDANTS–RESPONDENTS/CROSS–APPELLANTS, AND KEITH B. JORDAN, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued December 1, 1997—Decided January 15, 1998.

Before Judges PETRELLA, SKILLMAN and EICHEN.

*Elliot Scher,* argued the cause for appellant/cross-respondent Janet C. Denis (*Allen C. Marra,* on the brief).

*John Pigeon,* First Assistant Corporation Counsel, argued the cause for respondent/cross-appellant City of Newark (*Michelle Hollar-Gregory,* Corporation Counsel; *Kathleen C. Goger,* Assistant Corporation Counsel, on the brief).

No other parties participated in this appeal.

The opinion of the court was delivered by

EICHEN, J.A.D.

This is an action brought under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3 (the Tort Claims Act). Plaintiff Janet Denis appeals from a directed verdict entered in favor of defendants City of Newark (the City) and the Newark Police Department (the Department) after the close of plaintiff's case. *R.* 4:37–2(b).

The appeal arises out of an incident in which plaintiff was unjustifiably struck on the head with a police radio by an on-duty police officer, Keith B. Jordan, Sr., in Newark after the officer

issued her a careless driving ticket.[1] Plaintiff was charged with assault and resisting arrest and was detained overnight in jail after Jordan falsely reported to his fellow officers that plaintiff had attacked him.[2] The following is plaintiff's uncontested version of the event.

On Sunday, October 17, 1993, at approximately 5:30 p.m., plaintiff, then twenty years old and a junior at Rutgers University in Newark, was approached by Jordan after making an illegal U-turn on Broad Street. Apparently, Jordan had observed plaintiff's illegal maneuver from a police kiosk located across the street. After plaintiff made the U-turn and while she was stopped at a traffic light, Jordan approached her car on foot. As plaintiff was searching for her credentials, plaintiff asked Jordan if he "could possibly not issue [her] the ticket" because her "insurance rates [were] high." Jordan responded, "Shut the fuck up. I don't want to listen to your bullshit story."

Jordan then took plaintiff's credentials and went into the police kiosk. Approximately ten minutes later, Jordan returned to plaintiff's car and threw two tickets into the car. As Jordan walked away, plaintiff asked him to "hear [her] out." Jordan again responded, "I don't want to listen to your bullshit story, get the fuck out of here." Plaintiff claimed she was "shocked" and "couldn't understand why he was ... being irrational." After Jordan walked away from the car, plaintiff looked at the tickets and noticed that one ticket was for an illegal U-turn and one ticket for careless driving. Plaintiff then decided to speak to Jordan in the kiosk to determine why she was given a careless driving ticket. When plaintiff asked Jordan to explain why she had been issued two tickets, he once again responded with obscenities and demanded that she leave the kiosk. At that point, plaintiff requested to speak with a superior officer. An argument ensued which quickly

---

[1] Jordan was also named as a defendant in the action but did not appear and a default judgment was entered against him.

[2] The charges against plaintiff were later dismissed.

escalated to the point where Jordan pulled plaintiff by the shoulder and, when she did not move, "struck [her] on the [fore]head with his [police] radio" and "punched her in her left cheek and under her right breast." Plaintiff, who described herself as 5′2″ and 120 pounds, testified that Jordan was "stocky" and appeared to be 5′10″. Plaintiff described what happened after Jordan struck her as follows:

> I started crying. Actually, as soon as he struck me, I started bleeding a lot. I bled profusely and the blood was gushing down the left side of my face, so I thought I was blind. So [the] first words out of my mouth [were], "I'm blind, I'm blind, look what you've done to me." And [then] I put my hands over my head because he continued to struggle with me. . . . [I]t seemed like he still wanted to hurt me.
>
> * * * *
>
> I thought he was going to kill me or rape me or something, because he wouldn't . . . stop and then there was blood all over the place. He finally managed to restrain me. He put my hands behind my back and then he pushed me up against the glass door and then he locked the door.
>
> * * * *
>
> He told me to shut the fuck up that I was under arrest.

Plaintiff testified that, after a few minutes, Jordan radioed for back-up assistance, and when the other police officers arrived, he told them that plaintiff had attacked him because he gave her two tickets. Accordingly, plaintiff was taken into custody and transported to the hospital where she received stitches for her head injury, after which she was formally processed at police headquarters and detained overnight in jail.

Plaintiff instituted this action against Jordan and defendants seeking tort damages for assault and battery and false imprisonment. Plaintiff also asserted a claim against the public entity defendants for negligently hiring and retaining Jordan as a police officer alleging that they "knew or should have known" that Jordan "was a person of mean and vicious temperament . . . [because] he had previously committed assaults and batteries upon other persons." Prior to trial, the court dismissed the negligent hiring and retention claims after examining the documents in Jordan's personnel file *in camera* because plaintiff failed to present expert testimony to support their admissibility.

At the conclusion of plaintiff's case, the court entered a default judgment against Jordan for $100,000 in compensatory damages and $250,000 in punitive damages.[3] However, the court dismissed the action against defendants, determining that as public entities, they could not be liable for Jordan's willful misconduct under *N.J.S.A.* 59:2–10. In addition, the court determined that plaintiff had failed to present proof that she suffered injuries from the alleged false imprisonment.

On appeal, plaintiff argues that the trial court erred (1) in removing from the jury's consideration the question of whether Jordan's conduct was willful; (2) in rejecting plaintiff's claim of liability for negligent retention of Jordan as a police officer; (3) in denying plaintiff complete access to Jordan's personnel records; (4) in determining that defendants were immune from liability under *N.J.S.A.* 59:2–10 as a matter of law; and (5) in dismissing plaintiff's false imprisonment claim.

Defendants have filed a cross-appeal contending that the trial court erred in releasing any part of Jordan's personnel file on the grounds that (1) Jordan's personnel records are irrelevant because a public entity cannot be found liable for negligent hiring and retention under the Tort Claims Act; (2) the records are confidential and absolutely privileged; and (3) defendants are absolutely immune from liability for discretionary administrative action or inaction in police disciplinary matters. Defendants also argue that the court erred in allowing plaintiff's expert to testify because plaintiff failed to furnish an expert's report and in ruling that plaintiff's scar could be found to constitute a "disfigurement" under the Tort Claims Act.[4]

---

[3] The damage award against Jordan is not being appealed.

[4] The judgment on appeal was entirely in defendants' favor, and therefore, they lack standing to cross-appeal the court's rulings. *Howard Savings Instit. v. Peep*, 34 *N.J.* 494, 499, 170 A.2d 39 (1961). Moreover, since appeals are taken from orders and judgments, not rulings, we do not address defendants' challenge to the court's ruling allowing Dr. Sandoval's expert testimony or the ruling that

Although we do not agree with all of the reasons given by the trial court for dismissing plaintiff's complaint against the City and the Department, we affirm the order of dismissal for the reasons set forth in this opinion.

## I.

■ We reject plaintiff's claim that the trial court erred in removing the issue of whether Jordan's conduct was willful from the jury's consideration. The applicable standard is whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." *R.* 4:37–2(b). On such a motion, "[t]he trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969).

■ We have carefully reviewed the record in light of the arguments advanced and the applicable legal principles and conclude that the trial court properly granted defendants' motion to dismiss because there was no competent evidence to support plaintiff's argument that Jordan's assault on plaintiff was anything other than willful. Jordan's conduct was not negligent or reckless, and no reasonable jury could have concluded otherwise on the evidence presented. Plaintiff's arguments are clearly without merit. *R.* 2:11–3(e)(1)(E).

## II.

We next address whether plaintiff's proofs set forth a *prima facie* case of liability against defendants for negligently retaining

---

plaintiff's scar could be found to constitute a "disfigurement" under the Tort Claims Act. However, because defendants' argument that Jordan's personnel file should not have been disclosed is responsive to plaintiff's contention that she was entitled to disclosure of the entire personnel file, we resolve that issue as part of plaintiff's appeal.

Jordan as a police officer knowing of his dangerous propensities and the risk of injury he presented to the public.

*N.J.S.A.* 59:2–2 establishes the liability of a public entity "for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." A cause of action for negligent hiring/retention of employees in the private sector was first recognized by our Supreme Court in *Di Cosala v. Kay,* 91 *N.J.* 159, 450 *A.*2d 508 (1982), under the theory of *respondeat superior.*

Prior to the enactment of the Tort Claims Act, our highest court observed, in a similar vein, that claims against police departments for negligent training and supervision of police officers furnish separate and independent grounds for liability against a public entity under principles of vicarious liability. *See McAndrew v. Mularchuk,* 33 *N.J.* 172, 184, 162 *A.*2d 820 (1960). In that case, after a police officer shot an unarmed juvenile in the back during a police pursuit, the plaintiff filed a complaint against the municipality for failing to provide firearm training to the officer. In the course of its decision, the Supreme Court cited with approval numerous out-of-state cases where liability was imposed upon a municipality for injuries inflicted by police officers, not only for their active wrongdoing, but for the municipality's own independent negligence in hiring and/or retaining an officer knowing he had dangerous propensities. *McAndrew v. Mularchuk, supra,* 33 *N.J.* at 187–89, 162 *A.*2d 820. Quoting from the Court of Appeals of New York in one such case, the Court stated:

> It follows that where, in circumstances such as those we are now considering, the retention of an employee may involve a known risk of bodily harm to others, the field in which that discretion may be exercised by the head of a department is limited. It is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived.
>
> [*Id.* at 187, 162 *A.*2d 820 (quoting *McCrink v. City of New York,* 296 *N.Y.* 99, 71 *N.E.*2d 419, 422 (1947)).5]

---

5 In *McCrink,* the police officer was "a known alcoholic, and as such troublesome and vicious. He had repeatedly been subjected to disciplinary action

Applying the foregoing rationale, the *McAndrew* Court concluded that a jury question had been presented as to whether the municipality was liable for the "active wrongdoing" of its chief of police, stating:

In our judgment, the needs of the present-day environment require us to move on to a consideration of the broader ground of responsibility of the municipality under the doctrine of *respondeat superior* for the negligent acts of commission of ordinary agents or employees perpetrated in the course and scope of their employment.

[*Id.* at 189, 162 *A.*2d 820.]

The Tort Claims Act did not change the well established body of law enunciated in *McAndrew*. Indeed, the Attorney General's Task Force on Sovereign Immunity Report, which accompanied *N.J.S.A.* 59:2–2, indicates that "[t]his provision specifically adopts the general concept of vicarious liability expressed by the New Jersey Supreme Court in *McAndrew.*" Margolis & Novack, *Claims Against Public Entities*, 1972 Task Force Comment on *N.J.S.A.* 59:2–2 (1997). The report also states that "this section provides a flexible liability provision which will permit the courts to adapt the principles established in this act to the particular circumstances of the cases coming before them." *Ibid.*

In this case, the Department knew or should have known of Jordan's dangerous propensities. Jordan's personnel file contained documents concerning three incidents in which Jordan was disciplined for assaultive behavior on defenseless citizens. Two of the incidents predated the assault in this case.[6] Additionally, the

---

because of excessive use of alcohol. While off duty, but carrying his revolver pursuant to regulations, he shot two people." *McAndrew v. Mularchuk, supra,* 33 *N.J.* at 187, 162 *A.*2d 820.

[6] The incidents are as follows: on January 12, 1990, Jordan punched a citizen in the mouth following an automobile accident in which Jordan's vehicle collided with the citizen's vehicle; and on January 30, 1990, Jordan slapped a woman following a motor vehicle accident. On March 6, 1995, he was again disciplined after pleading guilty to a simple assault. All three incidents consisted of unprovoked acts of violence on members of the public.

file contained documents showing that Jordan had been suspended nine times for violating police regulations between 1985 and 1995.[7]

Accordingly, we conclude that plaintiff's proofs set forth a *prima facie* case of liability against the public entity defendants for negligently retaining Jordan as a police officer knowing of his dangerous propensities and the risk of injury he presented to the public. Recognizing that liability may exist against a public entity under the Tort Claims Act for its negligent retention of a police officer who presents a clear public danger not only serves as an expression of societal disapproval of unjustifiable police violence, but also encourages public entities to impose appropriate sanctions in such circumstances.

## III.

We are also persuaded that plaintiff should have been permitted to review all documents pertaining to Jordan's disciplinary history in his personnel file and reject defendants' contention that those documents contain confidential information protected by a privilege. Defendants argue that permitting disclosure of Jordan's personnel file would impede the ability of the law enforcement community to conduct internal investigations and to assure candor and frankness of witnesses in those investigations. We disagree.

After defendants objected to the disclosure of Jordan's personnel file, the trial court reviewed all of the file documents *in camera*.[8] The court concluded that the documents concerning the

---

[7] These reports detailed adjudicated violations for neglect of duty for failing to dispatch police units on reports of serious crimes, for making false statements, for being absent without permission, for leaving his post, for failing to report the loss of his weapon, for sleeping while on patrol duty, and for corrupt practices (taking bribes) in dealing with the public. On August 25, 1995, Jordan was finally discharged from the force.

[8] We reject defendants' argument that they should not have been required to respond to plaintiff's notice in lieu of subpoena because she failed to move to

three incidents of assault were relevant and would have been admissible but for plaintiff's failure to present expert testimony to support them. Regrettably, because the court did not record the bases for his determination not to release all of the records, we do not have the benefit of the court's reasons for its decision. Such findings and conclusions are essential for meaningful judicial review and should be routinely made when documents are reviewed *in camera;* the findings and conclusions can then be placed under seal of the court to preserve their confidentiality pending appeal. *R.* 1:7–4. However, since counsel for defendants furnished Jordan's complete personnel file to us at oral argument, we have performed our own independent review of the file documents, and conclude that, except for the disciplinary records of other officers contained in the file which are not relevant to these proceedings, the trial court should have ordered full disclosure of its contents. *See Asbury Park Press v. Seaside Heights,* 246 *N.J.Super.* 62, 586 *A.*2d 870 (Law Div.1990); *see also Shuttleworth v. City of Camden,* 258 *N.J.Super.* 573, 610 *A.*2d 903 (App.Div.), *certif. denied,* 133 *N.J.* 429, 627 *A.*2d 1135 (1992).

For the most part, the materials we reviewed were incident reports, complainants' statements, preliminary and final notices of disciplinary action and reports on the dispositions taken. These materials are the only evidence supporting plaintiff's claim that defendants were aware of Jordan's past conduct. Without these records, plaintiff could not show that defendants knew of his dangerous propensities or his other derelictions of duty, and could not establish a *prima facie* case of negligence against defendants. Thus, plaintiff demonstrated a strong need for the documents. We also note that the file contains no self-critical evaluative reports or reports of remedial measures instituted after Jordan was disciplined. Nor are there any statements by confidential informants. In these circumstances, we perceive no impediment to the complete release of Jordan's personnel file inasmuch as

---

compel defendants to produce Jordan's records after defendants asserted their claim of privilege. In these circumstances, we perceive no abuse of discretion.

plaintiff's need for the material clearly outweighs defendants' claims of purported confidentiality. *See Loigman v. Kimmelman,* 102 *N.J.* 98, 104, 505 *A.*2d 958 (1986).

## IV.

We next consider defendants' argument that even if defendants were negligent in retaining Jordan as a police officer, they are immune from liability under *N.J.S.A.* 59:2–3(b) because their conduct constitutes discretionary administrative action or inaction of a judicial nature.

■ *N.J.S.A.* 59:2–3 applies "[w]here immunity is claimed by a public entity based upon discretionary activities." *Longo v. Santoro,* 195 *N.J.Super.* 507, 515, 480 *A.*2d 934 (App.Div.), *certif. denied,* 99 *N.J.* 210, 491 *A.*2d 706 (1984). The relevant portions of that section of the Tort Claims Act read as follows:

a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature.

Subsection (a) deals with "high-level policymaking decisions" which are made at the planning level and involve the weighing of competing policy considerations; subsection (b) deals with the operational level of decisionmaking and does not implicate high level policymaking decisions. *See Costa v. Josey* 83 *N.J.* 49, 55, 415 *A.*2d 337 (1980); *see also Brown v. Brown,* 86 *N.J.* 565, 577, 432 *A.*2d 493 (1981); *Perona v. Township of Mullica,* 270 *N.J.Super.* 19, 29, 636 *A.*2d 535 (App.Div.1994); *Pacifico v. Froggatt,* 249 *N.J.Super.* 153, 591 *A.*2d 1387 (Law Div.1991) (holding that liability for the tort of negligent hiring and retention is not barred by *N.J.S.A.* 59:2–3(a)).

Whether to discharge or retain a police officer after he or she has been charged with official misconduct is, of course, a discretionary decision. However, whether a public entity should be immunized from liability for exercising that discretion is a more difficult issue and one which has not yet been addressed by this

court. Regrettably, the factual record before us on this important question is sparse. We do not know, for instance, whether disciplinary hearings were held for the prior assault charges. If they were, we do not know whether the hearings were part of an informal administrative process, or whether they were formal proceedings presided over by the chief of police. Similarly, we do not know what evidence, if any, was presented at such hearings. Nor do we know whether Jordan's prior misconduct was ever considered before he was disciplined.[9]

In the absence of a fully developed record, we decline to decide whether and under what circumstances a police department and municipality may or may not be immune from tort liability for its choice of sanction in the face of a known risk of danger to the public by one of its own officers. *Cf. Flodmand v. State Dep't of Institutions & Agencies,* 175 *N.J.Super.* 503, 510, 420 *A.*2d 365 (App.Div.1980), *declined to be followed for other reasons in Tice v. Cramer,* 133 *N.J.* 347, 627 *A.*2d 1090 (1993).

## V.

We next consider whether plaintiff has sustained her burden of proving damages under the Tort Claims Act and conclude that she has not. *N.J.S.A.* 59:9–2d provides that "[n]o damages shall be awarded against a public entity or public employee for pain and suffering" except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment" where medical expenses exceed $1,000. This provision has been interpreted to require plaintiff to demonstrate objective, medical evidence of permanent injury to recover damages against a public entity. *See Brooks v. Odom,* 150 *N.J.* 395, 402–03, 696 *A.*2d 619 (1997); *see also Collins v. Union County Jail,* 150 *N.J.* 407, 696 *A.*2d 625 (1997).

---

[9] In addition, Jordan's personnel file contained no documents concerning plaintiff's charges. Hence, we do not know whether a hearing was held or whether Jordan was ever disciplined for this incident.

■ At trial, plaintiff focused her claim for damages on allegations that she suffers from post-traumatic stress disorder.[10] Plaintiff's expert, Dr. Oscar Sandoval, testified that since the assault, plaintiff suffers from feelings of helplessness and hopelessness, nightmares, and has difficulty with her memory and concentration. Dr. Sandoval also explained the nature of the disorder and the course of treatment plaintiff followed. However, because plaintiff failed to furnish a comprehensive expert report, Dr. Sandoval was not permitted to testify concerning the permanency of the condition.[11] In the absence of proof of permanency, plaintiff's proofs on the element of damages were insufficient to permit recovery under the Act. *Ibid.*

■ Because we conclude that the court properly dismissed the action against defendants for failure to sustain her burden of proving a permanent loss, it is unnecessary to decide whether the court mistakenly exercised its discretion in dismissing plaintiff's negligent retention claim because she did not present expert testimony concerning Jordan's retention on the force. In tort actions generally, expert testimony is indispensable where "the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of a party was reasonable." *Butler v. Acme Markets, Inc.* 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982); *see State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984). In the absence of any foundation evidence concerning the basis for the decision to retain Jordan as a police officer after the prior assaults, we are unable to

---

[10] Although the alleged post-traumatic stress disorder was accompanied by a scar on plaintiff's forehead, her damage claim against defendants appears to have been limited to the emotional harm she suffered from the assault.

[11] Plaintiff did not supply an expert's report in discovery. The court nevertheless permitted her to rely on a one-page invoice for psychiatric services rendered by Dr. Sandoval beginning on January 30, 1995 as her report. The invoice included a diagnosis of "post-traumatic stress disorder" and references to the treatment rendered. On appeal, plaintiff has not challenged the limitations the court placed on her expert's testimony. Accordingly, we consider the issue abandoned.

determine whether expert testimony was required to assist the jury in evaluating the reasonableness of defendants' retention of Jordan as an officer.

## VI.

Lastly, we reject as clearly without merit plaintiff's argument that the court erred in removing her false imprisonment claim from jury consideration. Plaintiff maintains that questions of fact exist regarding whether the arresting police officers, other than Jordan, had probable cause to detain her on suspicion of assault and resisting arrest. Even if factual issues existed regarding the probable cause issue (and none appear in this record), in the absence of proof of permanent injury, the court properly dismissed plaintiff's false imprisonment claim.

The order of dismissal is affirmed; the cross-appeal is dismissed.